IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| v. | § | NO. 3:08-CR-116-K (01) |
| | § | |
| RODERICK LEACH | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendant Roderick Leach's Motion to Suppress (Doc. No. 20). As stated by the Court pursuant to an evidentiary hearing held on April 21, 2009, the Court **GRANTS** the motion. Accordingly, the statements made in response to a police interrogation and the evidence seized from Leach's residence on August 1, 2007, are hereby suppressed. The Court does not suppress evidence obtained by police from the prior search of Leach's vehicle.

### I. Background

Defendant Roderick Leach ("Leach") was indicted on various drug and gun stemming from a Dallas Police search of his car and his home in August 2007. Specifically, Leach is charged with possession with intent to distribute a controlled substance in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A)(iii), felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2), and possession of a firearm in furtherance of the commission of a drug trafficking crime in violation of 18

U.S.C. § 924(c)(1)(A). The indictment also includes a forfeiture count under 18 U.S.C. § 924(d) and 28 U.S.C. § 2461(c).

Leach was stopped for a traffic violation in the city of Dallas, Texas, and had seven outstanding misdemeanor warrants for his arrest. Police Officer Herb Ebsen testified that when Leach stepped out of his vehicle, a small blue plastic bag containing apparent cocaine was visible in the car's door. Ebsen said he found about twenty-five such "baggies" in the vehicle.

Leach's three children were in the vehicle at the time of the traffic stop. Ebsen showed a bag to one child, who told him "my daddy's got a whole bunch of them at the house." The children were released to Leach's wife, and Leach was taken to the Dallas narcotics division.

There, Leach was interviewed by Dallas Police Detectives Kenneth Francis and Andrew Ortiz, who questioned Leach and urged cooperation after informing him of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966). Transcripts of this interrogation, which the Court viewed on videotape, show the detectives made various representations to Leach about any evidence they might recover from his home:

> Det. Ortiz: Okay, you're not understanding what I'm saying here, man. Okay? You're not understanding what I'm saying. Look. I don't give a sh*t what you got. I don't give a f*ck. You got a couple of birds in there, I don't give a damn. We're not putting that stuff on you, man [. . .]
>
> Whatever's in the house, I can't let you keep. I need to go to your house, get

what's in your house, bring it back here, put in property, so it's there. I—That's what I need from you. I need you to give me consent to [go] to your house, let me go get the stuff.

According to testimony, a "bird" is slang for a kilogram of cocaine. After these representations by the detectives, Leach eventually asked, "What if there's a gun in my bag?" The detectives responded:

> Det Ortiz: Alright, see, I know what you're worrying about . . . [simultaneous]
> Det. Francis: He's told you a hundred times in here, and I told you . . .
> Det. Ortiz: None of that stuff in the house is going on you.
> Det. Francis: ... the stuff in there is not gonna be charged against you. All we're trying to do is get it out away from the kids. If there's a gun in there, it's even more important that it's gotta get out of the house.

During the exchange, Detective Ortiz apparently recognized that Leach was concerned about potential liability for felon in possession if police discovered a gun in his house. Detective Ortiz told Leach:

> That's what I'm saying. Just be straight with me. Tell me where everything's at. Tell me, "The dope's here. The gun's here. I've got another f*cking gat over here. I got this over here." Just tell me where the sh*t's at. Let me go in there. You show me good faith. Let me go in there, grab the sh*t, bring it out.
>
> You ain't gonna be charged with it. I'm telling you right now. You ain't gonna be charged with that stuff. Okay? I know that's what you're worried about. I . . . you didn't have to tell me, I knew there was a gun in the house man. I know you're a felon. Look, man. I'm telling you right now. That . . . you ain't gonna be charged with that.

Det. Francis stated that Mr. Leach could "sign a contract" (to "work off" his case) "for the drugs in the car." Leach then admitted that the detectives would find a

"big"—125 grams—of cocaine and multiple firearms, including a .38, a .357 magnum, and a .380, in the home. The officers then obtained and executed a search warrant, recovering cocaine and four guns from the home.

## II.   Analysis

Leach asks the Court to suppress his statements to the detectives under the Fifth Amendment and to suppress the evidence subsequently recovered from his home under the Fourth Amendment. Because the standard for evaluating the voluntariness of a defendant's waiver of his Fourth Amendment rights draws from the development of caselaw evaluating the voluntariness of a confession, *see, e.g., Schneckloth v. Bustamonte*, 412 U.S. 218, 223-27 (1973), the Court first examines the voluntariness of Leach's statements under the Fifth Amendment.

### A.   Fifth Amendment

"When a defendant challenges the voluntariness of a confession, the government must prove its voluntariness by a preponderance of the evidence in order for the confession to be admissible as substantive evidence at the defendant's criminal trial." *United States v. Garcia Abrego*, 141 F.3d 142, 170 (5th Cir. 1998) (citing *Self v. Collins*, 973 F.2d 1198, 1205 (5th Cir. 1992)).

In *Bram v. United States*, 168 U.S. 532, 542–43 (1897), the Supreme Court stated that the test for determining the voluntariness of a confession "is whether the confession

was extracted by any sort of threats or violence, or obtained by any direct or implied promises, however slight, [or] by the exertion of any improper influence." Since then, the Supreme Court has held that a strict reading of *Bram* is no longer the standard courts should use for voluntariness. *Arizona v. Fulminante*, 499 U.S. 279, 285–86 (1991). Instead, voluntariness must be determined based on the totality of the circumstances. *Id.* Thus, the existence of a promise constitutes but one factor in that determination and does not render a confession involuntary per se. *Hawkins v. Lynaugh*, 844 F.2d 1132, 1140 (5th Cir. 1988). "[I]ndirect promises do not have the potency of direct promises." *Id.*

It is clear, however, that "certain promises, if not kept, are so attractive that they render a resulting confession involuntary. A promise of immediate release or that any statement will not be used against the accused is such a promise." *Streetman v. Lynaugh*, 812 F.2d 950, 957 (5th Cir. 1987) (internal citation omitted). "[T]he question is whether the language used under all the facts and circumstances would lead [the defendant] to reasonably believe that he would not be held criminally responsible. . . ." *Hawkins*, 844 F.2d at 1139.

Here, Leach was promised that he would not face charges for drugs or guns found inside the house: "You ain't gonna be charged with it. I'm telling you right now. You ain't gonna be charged with that stuff. Okay?" The detectives' offer, in exchange for

Leach's statement, was highly attractive. Indeed, nothing could be more attractive to a felon facing a lengthy prison sentence if convicted. Additionally, the detectives told Leach they would contact Child Protective Services, or CPS, to take his children away if he did not cooperate. Although this indirect coercion is not determinative or necessarily prohibited, the Court finds it another factor in the totality of the circumstances that determine whether Leach's statement was voluntary.

The Government argues that the promises had little coercive effect on Leach, particularly given his criminal history and prior experience with law enforcement. The Government notes that the detectives' statements about Child Protective Services had little outward effect on the Defendant, who appeared unemotional on the videotape. Yet Detective Ortiz admitted that Leach gave police the information they sought and consented to the search of his home "closely" after detectives made their clear offer of leniency.

Although "a confession is not involuntary merely because the suspect was promised leniency if he cooperated with law enforcement officials," United States v. Santiago, 410 F.3d 193, 202–03 (5th Cir. 2005), here Leach was promised more than leniency: he was unequivocally promised "the stuff in there is not gonna be charged against you. All we're trying to do is get it out away from the kids."

Detective Ortiz testified that he did not intend to promise Leach he would never

be charged with possession of drugs and guns, only that he would not be charged "that night." Other than that statement by Detective Ortiz, nothing else in the transcript of the interrogation—nor any evidence at the suppression hearing—support that conclusion. Nothing supports the idea that Leach thought he was buying only twenty-four hours of freedom from the gun charges when he made his admissions to police.

The Court is thus persuaded by the totality of the circumstances that the detectives' explicit promises rendered Leach's statement involuntary and must be suppressed under the Fifth Amendment.

### B. Fourth Amendment

The exclusionary rule precludes the government from relying on illegally seized evidence. *United States v. Houltin*, 566 F.2d 1027, 1030 (5th Cir. 1978). The purpose of the exclusionary rule is to "deter unlawful police conduct." *United States v. Pope*, 467 F.3d 912, 916 (5th Cir. 2003).

"Although the Supreme Court has never had occasion expressly to adopt the position [that the exclusionary rule applies to the physical fruits of statements rendered involuntary by coercive interrogation], it is unquestionably correct." 3 WAYNE R. LAFAVE ET AL., CRIMINAL PROCEDURE § 9.5(a) (3d ed. 2007). "[T]hose subjected to coercive police interrogations have an *automatic* protection from the use of their involuntary statements (or evidence derived from their statements) in any subsequent

criminal trial." *United States v. Pitane*, 542 U.S. 630, 640 (2004) (plurality opinion); *cf. id.* at 646 (Souter, J., dissenting) ("[T]he Fifth Amendment privilege against compelled self-incrimination extends to the exclusion of derivative evidence.").

Yet, "[t]he primary limit on the exclusionary rule is that otherwise suppressible evidence will still be admitted if the connection between the alleged illegality and the acquisition of evidence is so attenuated as to dissipate the taint." *United States v. Grosenheider*, 200 F.3d 321, 327 (5th Cir. 2000) (quotation omitted). The "independent source" exception allows the "introduction of unlawfully discovered evidence when the police have acquired that evidence through a distinct, untainted source." *United States v. Zavala*, 541 F.3d 562, 577–78 (5th Cir. 2008) (quoting *Grosenheider*, 200 F.3d at 327). "Animating this doctrine is the recognition that the goal of the exclusionary rule is to put the police in the same, not a worse, position that they would have been in if no police error or misconduct had occurred." *Id.* at 578 (internal quotation marks omitted). "For the independent source exception to apply, the evidence obtained through the independent source must be 'identical to the evidence unlawfully acquired.'" *Id.* (quoting *Murray v. United States*, 487 U.S. 533, 538 (1988)).

Similarly, under the doctrine of "inevitable discovery," the government "must show that the [evidence in question] 'inevitably would have been discovered by lawful means.'" *Hudson v. Michigan*, 547 U.S. 586, 616 (2006); *see also Zavala*, 541 F.3d at 579.

Pursuant to the inevitable discovery doctrine, evidence is admissible if "the evidence would have been found despite, and independent of, [any constitutional] violation." *Hudson*, 547 U.S. at 617. For the inevitable discovery exception to the exclusionary rule to apply, the government must prove by a preponderance of the evidence (1) that there was a reasonable probability that the evidence would have been discovered by lawful means in the absence of police misconduct, and (2) that the government was actively pursuing a substantial alternative line of investigation at the time of the constitutional violation. *United States v. Lamas*, 930 F.2d 1099, 1102 (5th Cir. 1991). "[T]he exception involves no speculative elements but focuses on demonstrated historical facts." *United States v. Cherry*, 759 F.2d 1196, 1205 n.10 (5th Cir. 1985).

In *Lamas*, the Fifth Circuit held that when officers have probable cause to search, and have dispatched a fellow officer to acquire a warrant, evidence found in the place to be searched will inevitably be discovered. 930 F.2d at 1102. Yet the Government here presented no evidence that it was pursuing any alternative line of investigation at the time the detectives questioned Leach and made the promises to him. Both detectives admitted that the sole basis for the warrant was the information they received from Leach during his interrogation—information Leach gave them only after police made their improper promises. Thus, based on the record before the Court, it is impossible to speculate whether in the absence of misconduct, the police would have obtained the

search warrant. The Government has not carried its burden to prove by a preponderance of the evidence that the inevitable discovery exception should apply.

Any reliance on the independent source doctrine would require similar speculation by the Court. For the independent source doctrine to apply, the Government must show "(1) that the police would still have sought a warrant in the absence of the illegal search; and (2) that the warrant would still have been issued (i.e., that there would still have been probable cause to support the warrant) if the supporting affidavit had not contained information stemming from the illegal search." *United States v. Runyan*, 290 F.3d 223, 235 (5th Cir. 2002) (citations omitted). Notably, Leach's admission that he had a "big" of cocaine in the home was included in the affidavit supporting the search warrant application. That admission came only after Leach made several denials and the police made the promises to him. If the detectives believed the statement by Leach's child that "my daddy's got a whole bunch of [baggies] at the house" was sufficient to support the search warrant, it would have been wholly unnecessary for the detectives to procure Leach's statement with such promises. Yet the child's statement, as the detectives admitted, was not even included in the application for the warrant. Detective Ortiz additionally stated that police were not able to get a search warrant before Leach admitted to having a "big" of cocaine at his home. Thus, there would not have been probable cause to support the warrant without Leach's admissions because the warrant

would have been devoid of any tie between the drugs found in Leach's car and the drugs and guns in his home. *See id.* at 237 (requiring a court to "purge" the search warrant affidavits of any reference to illegal pre-warrant findings). The fact that detectives failed to include the child's statement in the search warrant affidavit, despite their claim that the statement alone would have been sufficient to support the warrant, undercuts any contention that Leach's small child was a sufficient independent source. The Court concludes that this rationale was an afterthought, a *post hoc* effort to salvage a defective warrant. Thus, the Court finds that the physical evidence recovered was not the result of an independent source, but rather fruit of the poisonous tree.

By suppressing this evidence, the Court only holds the police to their word.

### III.   Conclusion

For the foregoing reasons, the statements by Leach to Detectives Ortiz and Francis and the evidence obtained from Leach's residence are suppressed. The Court does not suppress evidence obtained by police from the prior search of Leach's vehicle.

**SO ORDERED.**

Signed August 10th, 2009.

*Ed Kinkeade*
ED KINKEADE
UNITED STATES DISTRICT JUDGE